# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2012

## STATE OF TENNESSEE v. DORIS SHARPHINE HALLIBURTON

**Appeal from the Circuit Court for Dyer County**
No. 10-CR-296      Russell Lee Moore, Jr., Judge

_____

**No. W2011-02309-CCA-R3-CD  - Filed September 17, 2012**

_____

The Defendant-Appellant, Doris Sharphine Halliburton, was convicted by a Dyer County jury of aggravated assault, a Class D felony, and was sentenced as a Range I, standard offender to a term of three years, with Halliburton to serve one year in the Dyer County Jail before serving the remaining two years of her sentence on supervised probation.  On appeal, Halliburton argues that:  (1) the evidence was insufficient to support her conviction and (2) her sentence was excessive.  Upon review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

James E. Lanier, District Public Defender; Howell Tod Taylor, Assistant Public Defender, for the Defendant-Appellant, Doris Sharphine Halliburton.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Karen W. Burns, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On March 18, 2010, Halliburton stabbed the victim, Larry McDonald, an ex-Marine, in his car in Dyer County, Tennessee.  Halliburton was later charged with aggravated assault. At trial, she admitted that she stabbed the victim, her fiance at the time, but claimed that she acted in self-defense.

**Trial**.  At the time of the offense, the victim and Halliburton had been dating for approximately two years.  The victim said that Halliburton spent the night with him once a week and that he typically gave Halliburton, who was a student, approximately $100 a week and paid for her school books in an effort to assist her financially.  Despite the length of their relationship, the victim did not know where Halliburton lived and had dropped her off at approximately a dozen different locations.  Shortly before the offense, the victim suspected Halliburton of infidelity.

On March 18, 2010, the victim stated that he picked up Halliburton, her mother, and her brother at Walmart for the purpose of taking them to see a comedian at a casino in Caruthersville, Missouri.  Because the group was running late, they missed the comedian's show and decided to gamble at the casino.  The victim subsequently won $200 playing roulette.  When he told Halliburton about his good fortune, she wanted a portion of his winnings, which he declined to give her.  At the end of the night, the victim drove the group home, and the victim and Halliburton began arguing.  The victim asked Halliburton if she was seeing someone else, which Halliburton denied.  Because the victim did not believe Halliburton, he informed her that he was ending the relationship, which angered Halliburton.

When the group arrived at Halliburton's mother's house, the victim said Halliburton refused to get out of the victim's car.  The victim asked Halliburton's mother for assistance regarding her daughter, and she said she was not going to get involved.  Halliburton stayed inside the car and demanded that the victim drive her to Dyersburg.  The victim refused because he had to get up at 6:00 a.m. the next morning for work.  Instead, the victim offered to pay for Halliburton to take a taxi when they arrived at his home, which she declined.

When the victim and Halliburton were within two miles of the victim's home, Halliburton grabbed the steering wheel and told the victim that if she could not have him, then no one could. The victim pushed her away, while continuing to drive, and Halliburton lunged at him, stabbing him with a knife.  After Halliburton stabbed him a few times in his arm, the victim slammed on his brakes, and Halliburton, who had not been wearing her seatbelt, was thrown forward.  Halliburton continued to stab the victim, and the victim grabbed Halliburton's hand, which held the knife.  The victim refused to drop the knife and "froze up."  At the time, the victim said he feared for his life and was bleeding profusely. While still holding onto Halliburton's hand, the victim quickly drove to his brother's home, which was located next door to his own home.  When they arrived, the victim jumped out of the car with his keys and ran to his brother's front door.  Halliburton stayed inside the car. The victim said he never struck or hit Halliburton before she began stabbing him.

The victim's brother and sister-in-law immediately called an ambulance and wrapped the victim's arm in a towel.  A short time later, Halliburton began calling the victim's name

and tried to enter the home through the front door. The victim locked the door so that Halliburton could not get inside. Shortly thereafter, the ambulance arrived. The victim was later airlifted to the Regional Medical Center at Memphis because of his injuries.

Deputies Stoney Hughes and Phillip Barton of the Dyer County Sheriff's Department responded to the March 18, 2010, stabbing. Deputy Hughes arrived at the scene and spoke with the victim, who had a towel, soaked with blood, wrapped around his arm. He immediately noticed a "very significant blood trail" from the victim's car to the home's front porch. Deputy Hughes observed that the victim had sustained several stab wounds to his forearm as well as a severe stab wound to his abdomen. The victim informed Deputy Hughes that Halliburton, his girlfriend, had stabbed him.

Deputy Barton, who was en route to the crime scene, saw Halliburton walking down Unionville Road. When he stopped, he noticed that Halliburton had a locking-blade knife in her hand and was wearing a heavy coat, even though it was not particularly cold that night. Deputy Barton drew his gun and told Halliburton to put down the knife. When she complied, Deputy Barton placed the knife on the hood of his car and saw that it was covered in blood. Halliburton was forced to remove her coat as she was being secured, and Deputy Barton noticed that she had a substantial amount of blood on her white shirt. He also noticed that the left side of her face and lip appeared swollen, although Halliburton later refused medical treatment. When Deputy Barton asked her what happened, Halliburton said that she and her boyfriend "had gotten into an altercation on the way back home from the casino" and that she had stabbed him with her knife. She also said that "her boyfriend had hit her several times." Deputy Barton said that Halliburton told him that she acted in self-defense and that the victim hit her first.

Deputy Barton brought Halliburton to the crime scene, and Deputy Hughes spoke with her. Deputy Hughes noticed that she had "some swelling to the left side of her face" and that her clothes were covered in blood. Halliburton told him that she and the victim had been arguing and that when the victim began hitting her, she stabbed him in self-defense. She said that the victim first tried to force her to exit the car while it was still moving. She then stated that "he stopped the vehicle to hit her[.]" When Deputy Hughes asked her why she did not exit the car at that point, Halliburton "changed her story and said that [the car] was still rolling, [and that the victim] only slowed down." Deputy Hughes said that although the victim had admitted to him that he hit Halliburton, he asserted that he hit her in self-defense.

Charles Campbell, a paramedic who assisted the victim at the crime scene, said that the victim's stab wounds were "through and through[,]" meaning that the wounds began at the top of his arm and ended at the bottom of his arm and that the bones and ligaments could

be seen in the open wounds. Campbell said that the victim was bleeding excessively and did not appear intoxicated. When he saw the victim's wound to his abdomen, Campbell determined that the victim needed to be airlifted to the Regional Medical Center at Memphis.

Kevin Reed, an intake officer, observed Halliburton when she was first brought to the Dyer County Jail. He saw that Halliburton's lip was bleeding and that she had a bruise on her forehead. Although Officer Reed did not contact the on-call nurse or physician about her injuries, he did place Halliburton's name on a list so that she would be seen by a nurse the next morning. Reed said that Halliburton was able to walk and talk without difficulty at the time of booking.

Halliburton stated that she and the victim argued the night of the offense because the victim insisted that she spend the night with him as they were leaving the casino. She refused because she had to attend class the next day and did not want to wake up as early as the victim got up for work. The victim told her that if she did not spend the night with him, he would put her out of the car and make her walk. She then asked the victim to take her back to Walmart, where she would take a cab home. When they reached Great River Road near Halliburton's mother's house, the victim again threatened to put her out of the car so that she would have to walk.

After the victim dropped off Halliburton's mother and brother, Halliburton said she asked him to take her to Four Points, and he agreed. However, the victim told her that if she did not spend the night with him, he never wanted to see her again. Although the victim had agreed to drive Halliburton to Four Points, he instead turned his car in the direction of his house. Halliburton grabbed the steering wheel to "help [him] turn the car around[,]" and he hit her in the head. She said he hit two more times before she grabbed her knife and stabbed him. Halliburton said the victim kept hitting and choking her and pushing her against the passenger door. She said the car was still slowly moving as the victim hit her. The victim told her that he was going to "show [her] real pain[.]"

Halliburton said that the victim cut himself badly on the arm when he lunged for the knife. When she tried to help him stop the bleeding, he slammed her head into the car's dashboard. The victim began "driving like a mad man" until they arrived at his brother's house. Once there, the victim told her to get out of the car, but she stayed in the car to look for her glasses, which she had lost during the fight.

Halliburton said she overheard the victim telling his brother that she stabbed him because he was ending their relationship. When Halliburton approached the house to tell her side of the story, the victim tried to hit her again. Halliburton said that she used her cell

phone to call a cab and that she was going to use some of the $300 that she won at the casino for her cab fare.

On cross-examination, Halliburton admitted that she had spent many nights at the victim's house and claimed that they had been engaged. However, she denied spending the night at approximately a dozen different homes in Dyersburg. She also denied asking the victim for part of his winnings from the casino. She said that during their argument, the victim offered her the $200 he won to spend the night with him, which she refused. Halliburton also said that the victim bought her the knife she used at a convenience store the week before their argument. She stated that the cab she had called from her cell phone arrived just as she was being placed in the back of a patrol car. She further stated that Deputy Barton had found her approximately one-half mile from the crime scene because she did not want to be near the victim, even though she had told the cab to come to the victim's address.

On rebuttal, the victim stated that he had never threatened to force Halliburton out of his car and had never threatened to leave her anywhere. He said he did not know that Halliburton had a knife the night of the incident and had never seen her with this knife. Deputy Hughes said that Halliburton was not crying after the stabbing. He said that Halliburton told him that she did not get out of the victim's car at her mother's house because she did not want to pay $20 for a cab. He also stated that Halliburton never mentioned she was scared of the victim. Following the close of proof and deliberations, the jury convicted Halliburton of aggravated assault.

**Sentencing Hearing.** At the sentencing hearing, the court admitted the Board of Probation and Parole's presentence report as well as Westate's presentence report, with a few corrections, into evidence. These reports showed that Halliburton's criminal history included at least nine misdemeanor convictions, including convictions for writing worthless checks, failure to appear, failure to report to jail, and contempt of court. Halliburton, during her statement of allocution, maintained her innocence and stated that she hoped to continue her education so that she could work in a healthcare field.

At the conclusion of the hearing, the trial court applied two enhancement factors, namely that Halliburton had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and that "[t]he personal injuries inflicted upon . . . the victim [were] particularly great." T.C.A. § 40-35-114(1), (6) (2006). Regarding mitigating factor eleven, that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[,]" the court found that it

"may very well be applicable." Id. § 40-35-113(11) (2006). However, the court placed more emphasis on the applicable enhancement factors than the mitigating factor.

The trial court noted that Halliburton had "a significant criminal record" of misdemeanors. The court also found that Halliburton had failed to take responsibility or show any remorse for her actions and had a poor potential for rehabilitation. The court, concluding that "some degree of incarceration [was] appropriate in this case[,]" found that Halliburton had "a long history of criminal conduct" and that "[m]easures less restrictive than confinement ha[d] frequently or recently been applied unsuccessfully" to her because she had received alternative sentences in nearly all of her previous convictions. Id. § 40-35-103(1)(A), (C) (2006).

As a Range I, standard offender, Halliburton was subject to a sentence of three to six years for her aggravated assault conviction. See id. § 40-35-112(a)(3) (2006). Ultimately, the court gave Halliburton "one more chance at an alternative sentence" and imposed a three-year sentence, with Halliburton to serve one year in the Dyer County Jail before serving the remaining two years of her sentence on supervised probation.

**ANALYSIS**

**I. Sufficiency of the Evidence.** Halliburton argues that the evidence is insufficient to support her conviction for aggravated assault because it shows that she acted in self-defense. We disagree.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928

S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Halliburton argues that she stabbed the victim in self-defense. Tennessee Code Annotated section 39-11-611, which was in effect at the time of the offense, states, in pertinent part:

> (b)(1) Notwithstanding the provisions of § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where such person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding the provisions of § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where such person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611 (Supp. 2008) (amended 2009, 2012). "The State carries the burden of proving that the defendant did not act in self-defense." State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim App. 1996)). The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). It is within the jury's prerogative to reject a claim of self-defense. Id.

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to support Halliburton's conviction for aggravated assault. As relevant here, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(ii). "A person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another[.]" Id. § 39-13-101(a)(1).

The victim testified that Halliburton, as the first aggressor, stabbed him when he threatened to end their relationship. Deputy Barton stated that Halliburton was wearing a heavy coat over her blood-soaked shirt on a night that was not particularly cold. Deputy Hughes testified that Halliburton was not crying the night of the offense and never told him that she was scared of the victim. Deputy Hughes also testified that Halliburton changed her story when he asked her why she did not exit the car when the victim began hitting her. Officer Reed testified that Halliburton's injuries the night of the incident were not serious enough to warrant summoning the on-call nurse or physician and that she was able to walk and talk without difficulty at the time of her booking. Halliburton told Deputy Hughes that she did not exit the car at her mother's house because she did not want to pay $20 for a cab; however, she testified at trial that she had called a cab from her cell phone and was going to pay for it out of her $300 in winnings from the casino. No evidence was presented showing that Halliburton called 9-1-1 or the police during or after the incident in this case. As we previously noted, it was within the prerogative of the jury to reject Halliburton's claim of self-defense. See Goode, 956 S.W.2d at 527. Moreover, we will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Accordingly, the evidence was sufficient to sustain Halliburton's conviction.

**II. Sentence.** Halliburton also argues that her sentence of split confinement is excessive. Specifically, she argues that the two enhancement factors and one mitigating factor applied in this case should not have resulted in a one-year sentence of confinement. We again disagree.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, in a case where "the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008) (citing State v.

Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)).  Because the trial court properly considered the purposes and principles of the sentencing act, our review is de novo with a presumption of correctness.  See id. at 345-46; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

> A trial court, when sentencing a defendant, must consider the following:
>
> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006); see Carter, 254 S.W.3d at 343; State v. Hayes, 337 S.W.3d 235, 264 (Tenn. Crim. App. 2010).  In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed."  T.C.A. § 40-35-103(5) (2006).  The defendant has the burden of showing the impropriety of the sentence.  See id. § 40-35-401(d) (2006), Sentencing Comm'n Comments.

In imposing a sentence, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors."  Carter, 254 S.W.3d at 344 (quoting T.C.A. § 40-35-210(c) (2006)).  However, "a trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion."  Id. at 345.  On appeal, this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act."  Id. at 346.

We conclude that the trial court did not err in sentencing Halliburton. The trial court properly applied the enhancement factors that Halliburton had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and that "[t]he personal injuries inflicted upon . . . the victim [were] particularly great." T.C.A. § 40-35-114(1), (6). The court also gave Halliburton the benefit of the mitigating factor that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]" Id. § 40-35-113(11). However, the court noted on the record that it placed more emphasis on the applicable enhancement factors than the mitigating factor. The court, concluding that "some degree of incarceration [was] appropriate in this case[,]" found that Halliburton had "a long history of criminal conduct" and that "[m]easures less restrictive than confinement ha[d] frequently or recently been applied unsuccessfully" to her. Id. § 40-35-103(1)(A), (C). The record supports the trial court's findings regarding these factors. Moreover, Halliburton failed to satisfy the burden of establishing her suitability for full probation. Id. § 40-35-303(b). Accordingly, we conclude that the trial court's sentence was proper.

## CONCLUSION

Upon review, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE